USHER (McBRATNEY v.). See Case No. 8,661.

USHER (MADDUX v.). See Case No. 8,936.

USTICK (POSTMASTER GENERAL v.). See Case No. 11,315.

UTICA, The (SMITH v.). See Case No. 13,-123.

## Case No. 16,806.

### The UTILITY.

[1 Blatchf. & H. 218.] [1]

District Court, S. D. New York. March 26, 1831.

MARITIME LIENS—SUPPLIES—STALE CLAIMS.

1. In a case of supplies furnished in New-York to a vessel owned in North Carolina, where more than two years had elapsed, and no demand of payment had been made of the master who contracted the debt, or of those who owned the vessel when the debt was contracted, and the vessel had since made several voyages between New-York and North Carolina, and been sold at public auction to a bona fide purchaser without notice of the debt: *Held,* that the lien was lost.

[Cited in Saunders v. Buckup, Case No. 12,-373; The H. B. Foster, Id. 6,291; The Boston, Id. 1,669; The Dubuque, Id. 4,110; The Bristol, 11 Fed. 162; The Rapid Transit, Id. 335; Re Wright, 16 Fed. 483; The J. W. Tucker, 20 Fed. 133; The Young America, 30 Fed. 792; The Lyndhurst, 48 Fed. 840.]

2. When a claim becomes stale in the admiralty, considered.

[Cited in The Romp, Case No. 12,030.]

This was a libel in rem against the schooner Utility, for supplies of ship-chandlery fur-

---

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

nished her by the libellant at New-York. The vessel was owned in North Carolina. The supplies were furnished between the months of May and November, 1823. Her then master was part owner of her at that time. She left New-York after receiving the supplies, with the knowledge of the libellant, and without any attempt on his part to detain her. After that, she made several voyages between North Carolina and New-York, but there was no proof that her being in the latter port was known to the libellant. On the 9th of February, 1829, she was sold, in North Carolina, to one Oliver. He having become insolvent, she was sold, on the 31st of May, 1830, by his assignees in that state, at public auction, and was purchased by the claimant, without notice of the libellant's claim. No demand of payment was ever made by the libellant of the master who contracted the debt, or of the then owners of the vessel. The libel was filed on the 7th of December, 1830.

Edwin Burr and Erastus C. Benedict, for libellant.

John L. Mason, for claimant.

BETTS, District Judge. The civil law gave a privilege, or right to priority of payment, to artificers and material men, for all debts created in the building or refitment of vessels. "Quod quis navis fabricandæ, vel emendæ, vel armandæ, vel instruendæ causa, vel quoquo modo credideret, vel ob navem venditam petat, habet privilegium post fiscum." Dig. lib. 42, tit. 5, § 34 (Ed. Gothof) p. 1529. This privilege, which, in the Roman law, had the effect of a tacit mortgage, and took preference of express mortgages of a subsequent date (Domat, bk. 3, tit. 1, § 5; Dig. lib. 20, tit. 2), is recognised in the maritime law of the present day, and is enforced by courts of admiralty, as it was in the civil law, by proceedings in rem. 3 Kent, Comm. 169–171; Abb. Shipp. (Ed. 1830) 109. I consider these authorities as abundant proof of the jurisdiction of this court in respect to the subject matter of the present action, and shall therefore not enter now into a discussion of this doctrine as an open question.

It would seem most reasonable, that a privilege of such efficacy, and which is not made manifest by any public act or registration, should not be suffered to lie latent, to the prejudice of third persons who acquire interests without notice of its existence. To allow claims of this character to rest dormant indefinitely, would hardly comport with the wholesome equity of the civil law which gave origin to them, or with the principles upon which they are sustained and effectuated by the courts of modern times. The conveniences and facilities of commercial enterprise would not be promoted, but would be vexatiously incommoded by such a rule. Yet, no definite limitation to the time within which these privileges might be enforced, seems to

have been declared by law. As they possessed the character of quasi mortgages, under the Roman law, they were undoubtedly enforced as mortgages. So long as the vessel remained in the port where her debts were contracted, she might well be considered as in pledge or pawn, and be immediately sold to satisfy the claim, upon the usual personal notice to the debtor. 1 Browne, Civ. Adm. Law (2d Ed.) 37. The statute of this state seems to regard the lien given in respect to domestic vessels, in the nature of a pawn, for, if the creditor permits the vessel to leave the state, he is divested of his lien. 2 Rev. St. 493, § 2.

Whether the tacit mortgage, when the thing bound remained in the hands of the creditor, was to be enforced by the action serviana, hypothecarious, or pignoratitious (Dig. lib. 20, tit. 1, § 4, and tit. 5, §§ 6, 7), and judicial sale (Code, lib. 8, tit. 28, § 4; Dig. lib. 34, tit. 3, § 1), in which other remedies might undoubtedly be had, as against the debtor, than merely subjecting the thing bound to a judicial sale or delivery to the creditor in satisfaction of his privilege, without regard to the time when the obligation was incurred or the action instituted, or whether the claim must have been set up and pursued whilst the subject of pledge remained in visu, does not appear to have been distinctly determined by the civil law. The modern law, in adopting the rule, seems to have left it with all its original uncertainty as to the time, if not the manner, of its enforcement. The statutes of limitation of the respective states are not understood to have any application to proceedings on the instance side of the court of admiralty (Brown v. Jones [Case No. 2,017]; Willard v. Dorr [Cases Nos. 17,679 and 17,680]), and, accordingly, there would be no other limitation to prosecutions of this character than what is necessarily connected with the nature of the claim, or is implied by the court in analogy to bars in similar cases at law.

Limitations to actions were known to the civil law, and did not vary essentially from those introduced into modern legislation, with this peculiarity as to one species—prescriptions—that, although a right by prescription might be acquired by three years' uninterrupted enjoyment of a thing, yet the action to try that right might be brought at any time within, in one case, twenty years, and in another, thirty years, after the claimant had lost possession. Though these limitations may have been applied to all cases resting in contract, and may, therefore, have embraced express mortgages, yet there appears to have been no provision in cases of tacit mortgages, either limiting the time within which the creditor might sell, or the mortgagor might satisfy the debt and repossess himself of the pledge. The general equity administered in the prætorian courts was competent to protect parties, in this respect, from any gross oppression. But this branch of their powers

does not appear to have called for any fixed and precise edicts or system of rules. If relief in this behalf was sought, it was accorded upon the special facts presented in the particular case, and not in conformity to any general law. The only general restriction, adopted by the courts of chancery and admiralty, upon the right to sue, where there is no statutory bar, is, that they will not take cognizance of stale demands. It is manifest that this limitation cannot have regard to lapse of time merely, because a demand may be delayed a long period, under circumstances affording a most equitable excuse, and will then be sustained, though it might be lost at law by the interposition of a positive bar. Neither would it comport with the interests of navigation, that these tacit liens should endure, as a general rule, until they might be termed in law, stale. Even in regard to seamen's wages, which are eminently first in the privileged class, the courts exact the most satisfactory reasons for a protracted delay in bringing suit for them (Willard v. Dorr [Case No. 17,680]); otherwise, their lien upon the vessel is lost (Trump v. The Thomas [Id. 14,-206]). All the cases seem to regard this privilege as one, the advantages of which may be relinquished or lost by the party; and the facts presented by the particular case are scrutinized with a view to ascertain whether they afford evidence of either the extinction or the waiver of the privilege. A reasonable ground of presumption is all that is required, and, in forming its conclusion, the court will make every intendment against the continuance of the lien, which a jury ought to make on a trial before them. Willard v. Dorr [Id. 17,679]; Stevens v. The Sandwich [Id. 13,-409], note; Hall's Emeri, 235. note; Trump v. The Thomas, supra. The lien given by the statute law of this state is divested after twelve days from the vessel's leaving port, or on her departure upon a foreign voyage. 2 Rev. St. 492, 493. And ordinarily, if a vessel subject to these silent liens, is suffered to leave the port where they are acquired, the presumption, in cases not governed by the statute, would be, that they had been waived. Artificers and material men would rarely consent to the departure of the vessel, unless satisfied with the responsibility of the owner, until other security was furnished them; and it would be a fair inference for a jury to draw, from the single fact of the vessel's being permitted to leave port, that other security had been substituted, or that the personal responsibility of the owner or master had been relied on. This, however, is not a conclusion of law, and the presumption may be rebutted by other circumstances. The more common, and, probably, the most satisfactory excusatory circumstances would be, that the master and owners were unknown to the creditor, and that the supplies were furnished with a view to fit the vessel for a return to her home port. I have always allowed the lien in such cases to pursue the vessel

to her home port, or to a port of discharge or refitment, in case she was on a trading adventure; and, on evidence of due diligence to enforce it at either place, I should have no difficulty in sustaining the lien subsequently, whenever the vessel could be arrested. As, in this case, if it had been shown that the libellant's claim had followed the schooner to North Carolina, and that payment had been sought there without success, or that the vessel could not have been arrested until the time when the present warrant was obtained, I should not have considered the mere changes of situation of the vessel, or the lapse of time since the debt accrued, as a bar to its recovery in this mode. See The Mary [Case No. 9,186.] No explanatory proofs are offered; and, upon the bald case of a credit given in 1828, I should feel great repugnance to recognising it as a continuing lien on the vessel three years subsequently.

There is another material particular in this case. The vessel has been twice sold, and is now in the hands of a bona fide purchaser without notice of this claim. The last purchase was at public auction, and two years after a portion of this debt had been contracted. I am not disposed to hold that a sale will, per se, necessarily divest the lien. No act of the owner, before a reasonable time has been allowed the creditor to set up his lien, should destroy its efficacy. His right should retain its force until impaired by laches of his own, or superseded by the legal or equitable rights of others. To permit an owner to free his vessel from incumbrances of this character, by transferring her to another person, might operate as a bounty to fraud and collusion. Nor would a purchaser, particularly at private sale, be ordinarily misled or wronged by the existence of tacit liens. He knows well the liabilities incident to the property, and proper precaution would, no doubt, be taken against them in the payment of the purchase money.

These considerations apply chiefly, however, to purchases made during the voyage of the vessel home, or immediately on her arrival, and under circumstances calculated to intercept the application of any lien which may be in a course of enforcement. The French law, which is also adopted in the Civil Code of Louisiana, permits a creditor, who has a privilege on a vessel, to pursue it while the vessel is in the possession of any person who obtained possession by virtue of a sale during her voyage; but, if the vessel was in port at the time of sale, and afterwards made a voyage in the name and at the risk of the purchaser, without any claim by the privileged creditor on the vendor, the privilege is lost and extinct against the ship. Code, Commer. liv. 2, tit. 1; Civil Code La. arts. 3206, 3210.

The proofs do not show distinctly whether this schooner has sailed in the name and at the risk of either one of her purchasers; but the presumption is, that she is now navigated

in behalf of her actual owner, and, if the case turned upon this circumstance, the libellant would be required to prove the contrary, to avoid the application of the rule to him. Although we may not find the rule stated in the general maritime law with the minuteness and precision of the regulations of the French code, yet, it appears to me that those regulations rest upon a principle common to the maritime law wherever it is administered —that all liens upon vessels are temporary and evanescent, and can be continued no longer than until a reasonable opportunity has been afforded for their enforcement. This doctrine was clearly recognised by the supreme court of the United States, in Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 332. That was the case of a bottomry bond. The voyage had been performed, and an opportunity had been afforded for enforcing the bond. The ship subsequently made two voyages, and was then sold under executions in behalf of other creditors, and then the bottomry creditor attached her in admiralty. The circumstances of the case were urged in argument to show that the bond had been satisfied in fact, but the court relied upon none of those considerations. The case was decided upon the general doctrine, that the lien had the preference for the voyage on which the bottomry was founded. But, said the court, "it certainly can extend no further." They considered the right of preference lost by the delay. The voyage need not necessarily be limited to the particular run to the home port, but would, in equity, be regarded as continuing until the vessel reached a place where the remedy might be enforced. A deviation to other ports, accidental or designed, and a close of the voyage at a port not contemplated by the parties or brought to the knowledge of the bond holder, would undoubtedly not be regarded as terminating the period allowed for the enforcement of the bond. There seems to be no sound reason for allowing a longer continuance to a tacit than to an express lien, and I am satisfied that the rule is both wholesome and equitable, which denies the continuance of the privilege beyond a period reasonably necessary for its prosecution and enforcement. I shall accordingly order the libel in this case to be dismissed, with costs.